FILED

JUDGE LEINENWEBER

MAGISTRATE JUDGE ROWLAND

JUL 14 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 16CR 448 |
| | ) | |
| v. | ) | Violations: Title 18, United States |
| | ) | Code, Section 1349; Title 21, United |
| MOHAMMED SHARIFF, | ) | States Code, Sections 841(a)(1) and |
| THEODORE GALVANI, and | ) | 846 |
| IRFAN MOHAMMED | ) | |

RECEIVED

**COUNT ONE**

JUL 14 2016

MICHAEL T. MASON
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

The SPECIAL JANUARY 2015 GRAND JURY charges:

1. At times material to this Indictment:

a. Midtown Medical Center was a medical practice located in Chicago, Illinois.

b. The 900 Pharmacy was a pharmacy located inside the same building as Midtown Medical Center.

c. Defendant MOHAMMED SHARIFF owned and managed Midtown Medical Center and the 900 Pharmacy.

d. Defendant THEODORE GALVANI was a physician licensed to practice medicine in the State of Illinois. GALVANI was also licensed, registered, and otherwise permitted by the United States and the State of Illinois to distribute, dispense, and administer controlled substances in the course of his professional practice.

e. Defendant IRFAN MOHAMMED was employed by defendant SHARIFF to assist defendant GALVANI at Midtown Medical Center.

f.     Individual A and Individual B were, at different times, the pharmacists-in-charge at the 900 Pharmacy.  Each was responsible for ordering and maintaining the pharmacy's inventory of controlled and non-controlled substances.

g.     Oxycodone was a narcotic pain reliever and a Schedule II Controlled Substance.

h.     Hydrocodone was a narcotic pain reliever and a Schedule III Controlled Substance.

i.     Alprazolam was a Schedule IV Controlled Substance intended for use in the treatment of anxiety.

j.     Promethazine with codeine was a Schedule V Controlled Substance intended for use in the treatment of coughs.

k.     Medicare was a federal health care benefit program, as defined in Title 18, United States Code, Section 24(b), which provided free and below-cost health care benefits that covered, among other things, medically necessary patient visits at a physician's office and associated medical tests.

l.     Health care providers who enrolled with Medicare were eligible for reimbursement for covered medical services that they provided to Medicare recipients.  By becoming a participating provider in Medicare, enrolled providers agreed to abide by the rules, regulations, policies, and procedures governing reimbursement.

m.     To be paid for services rendered, a Medicare provider was required to submit a claim for payment containing certain information, including

2

the type of services provided, the procedure code, the date and charge for such services, and a certification that the services were personally rendered by the provider or rendered incident to the provider's professional service.

        n.    Midtown Medical Center was enrolled as a provider with the Medicare program and assigned a provider number.

        o.    Defendant GALVANI was enrolled as a physician provider with the Medicare program and assigned a provider number, under which GALVANI, defendant SHARIFF, and others working on their behalf, submitted claims to Medicare.

        p.    Defendant GALVANI reassigned all payments he was due from Medicare to Midtown Medical Center.

        q.    All of the funds Medicare paid to defendant GALVANI were deposited into account XXXXX6526 held at TCF Bank under the name of Midtown Medical Center. Defendant SHARIFF was the sole signatory on this account.

        2.    Beginning no later than in or about February 2012, and continuing until on or about March 7, 2013, at Chicago, in the Northern District of Illinois, and elsewhere,

MOHAMMED SHARIFF,
THEODORE GALVANI, and
IRFAN MOHAMMED,

defendants herein, did conspire with each other and others to knowingly and intentionally dispense controlled substances, namely, a quantity of a mixture and substance containing oxycodone, a Schedule II Controlled Substance; a quantity of a

3

mixture and substance containing hydrocodone, a Schedule III Controlled Substance; a quantity of a mixture and substance containing alprazolam, a Schedule IV Controlled Substance; and a quantity of a mixture and substance containing promethazine with codeine, a Schedule V Controlled Substance, outside of the usual course of professional practice and without a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a)(1).

3.    It was part of the conspiracy that defendants SHARIFF, GALVANI, and MOHAMMED agreed to dispense and did dispense controlled substances, including oxycodone, hydrocodone, alprazolam, and promethazine with codeine, through Midtown Medical Center to individuals who the defendants knew did not have legitimate medical needs for such controlled substances.

4.    It was further part of the conspiracy that defendant SHARIFF directed defendant GALVANI to prescribe controlled substances, including oxycodone, hydrocodone, alprazolam, and promethazine with codeine, to individuals who came to Midtown Medical Center, including individuals who did not meet with GALVANI in person.   As SHARIFF and GALVANI knew, such prescriptions were issued without a legitimate medical purpose.

5.    It was further part of the conspiracy that defendants SHARIFF, GALVANI, MOHAMMED, and Midtown Medical Center employees working at SHARIFF's direction, demanded and received cash payments from uninsured individuals who obtained prescriptions for controlled substances without a legitimate medical purpose from GALVANI.   When an individual insured by

Medicare sought prescriptions for controlled substances without a legitimate medical purpose, SHARIFF, GALVANI, and others agreed to falsely bill Medicare for medical services that either were not rendered or were not medically necessary.

6.     It was further part of the conspiracy that defendants SHARIFF and GALVANI agreed to and did split the cash payments received from individuals who sought and obtained from Midtown Medical Center prescriptions for controlled substances without a legitimate medical purpose, and the funds received from Medicare for medical services that were either not rendered or not medically necessary.

7.     It was further part of the conspiracy that defendant GALVANI, at defendant SHARIFF's request, met with individuals, who were seeking prescriptions for controlled substances without a legitimate medical purpose, in groups of two or more, at the same time.

8.     It was further part of the conspiracy that defendant SHARIFF arranged for individuals to obtain prescriptions for controlled substances, including oxycodone, hydrocodone, alprazolam, and promethazine with codeine, among other controlled substances, from defendant GALVANI, knowing that the individuals had no legitimate medical need for those controlled substances.

9.     It was further part of the conspiracy that defendant MOHAMMED, for the purpose of substantiating the prescriptions that defendant GALVANI wrote outside of the usual course of professional practice and without a legitimate medical purpose, met with individuals who came to Midtown Medical Center seeking

5

controlled substances, prior to such individuals meeting with GALVANI. During these meetings, MOHAMMED encouraged the individuals to tell GALVANI that they suffered from ailments and injuries, which MOHAMMED had fabricated, in order to facilitate their receipt of controlled substances prescriptions for which they had no legitimate medical need.

10.    It was further part of the conspiracy that defendants SHARIFF, GALVANI, and MOHAMMED dispensed and caused the dispensing of thousands of dosage units of oxycodone, hydrocodone, alprazolam, and promethazine with codeine, among other controlled substances, to individuals who visited Midtown Medical Center, but received no meaningful physical examination or medical tests, and who had no legitimate medical need for such controlled substances.

11.    It was further part of the conspiracy that defendant MOHAMMED falsified the medical files of individuals who received prescriptions for controlled substances from defendant GALVANI, including prescriptions for oxycodone, hydrocodone, alprazolam, and promethazine with codeine, in an effort to substantiate the prescriptions that GALVANI wrote outside of the usual course of professional practice and without a legitimate medical purpose.

12.    It was further part of the conspiracy that defendant GALVANI, at the request of defendant SHARIFF, Individual A, and Individual B, increased the number of dosage units of non-controlled substances that GALVANI prescribed to decrease the ratio of controlled and non-controlled substances ordered and

maintained by the 900 Pharmacy, in an effort to avoid drawing law enforcement attention and scrutiny.

13.    It was further part of the conspiracy that defendants SHARIFF, GALVANI, MOHAMMED, and others misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes and acts done in furtherance of the conspiracy.

All in violation of Title 21, United States Code, Section 846.

## COUNTS TWO THROUGH NINE

The SPECIAL JANUARY 2015 GRAND JURY further charges:

On or about the dates listed below, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MOHAMMED SHARIFF and
IRFAN MOHAMMED,

defendants herein, together with Theodore Galvani and others, did knowingly and intentionally dispense a controlled substance, namely, a quantity of a mixture and substance containing oxycodone, a Schedule II Controlled Substance, outside of the usual course of professional practice and without a legitimate medical purpose, each such instance being a separate Count of this Indictment:

| COUNT | DATE | CONTROLLED SUBSTANCE |
|:-----:|:-----|:--------------------:|
| 2 | September 19, 2012 to M.F. | 120 Pills of 10 mg Oxycodone |
| 3 | October 23, 2012 to T.M. | 120 Pills of 10 mg Oxycodone |
| 4 | October 23, 2012 to V.A. | 90 Pills of 10 mg Oxycodone |
| 5 | November 6, 2012 to M.F. | 30 Pills of 30 mg Oxycodone |
| 6 | November 14, 2012 to T.M. | 60 Pills of 30 mg Oxycodone |
| 7 | November 28, 2012 to V.A. | 120 Pills of 10 mg Oxycodone |
| 8 | December 12, 2012 to M.F. | 60 Pills of 30 mg Oxycodone |
| 9 | December 12, 2012 to T.M. | 90 Pills of 30 mg Oxycodone |

In violation of Title 21, United States Code, Section 841(a), and Title 18, United States Code, Section 2.

## **COUNTS TEN THROUGH FIFTEEN**

The SPECIAL JANUARY 2015 GRAND JURY further charges:

On or about the dates listed below, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MOHAMMED SHARIFF and
IRFAN MOHAMMED,

defendants herein, together with Theodore Galvani and others, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing hydrocodone, a Schedule III Controlled Substance, outside of the usual course of professional practice and without a legitimate medical purpose, each such instance being a separate Count of this Indictment:

| COUNT | DATE | CONTROLLED SUBSTANCE |
|:---:|:---:|:---:|
| 10 | November 6, 2012 to M.F. | 120 Hydrocodone Pills |
| 11 | November 14, 2012 to T.M. | 120 Hydrocodone Pills |
| 12 | December 12, 2012 to M.F. | 120 Hydrocodone Pills |
| 13 | December 12, 2012 to T.M. | 120 Hydrocodone Pills |
| 14 | January 16, 2013 to T.M. | 150 Hydrocodone Pills |
| 15 | January 16, 2013 to V.A. | 150 Hydrocodone Pills |

In violation of Title 21, United States Code, Section 841(a), and Title 18, United States Code, Section 2.

## COUNT SIXTEEN

The SPECIAL JANUARY 2015 GRAND JURY further charges:

1.     Paragraphs 1(a) through 1(d) and 1(k) through 1(q) of Count One are incorporated here.

2.     At times material to this Indictment:

a.     Health care providers used a uniform system of coding to report professional services.  The American Medical Association published the Physicians' Current Procedural Terminology Manual which set forth numerical codes that defined the procedural and medical requirements that needed to be met in order to bill for a particular service.  Each claim form had to contain the five-digit Current Procedural Terminology (CPT) code identifying the service provided to a beneficiary on a particular date.

b.     New patient visits to a physician's office were billed under CPT codes 99201 through 99205, and established patient visits to a physician's office were billed under CPT codes 99211 through 99215.  The higher codes in each range represented visits of a more comprehensive nature, which also had a higher rate of reimbursement from Medicare.

c.     For an office visit to be billed properly using CPT code 99204, it was required to have all three of the following key components: a comprehensive history of the patient's present illness; a comprehensive physical examination of the affected body region or organ system; and medical decision making of moderate complexity.  According to the American Medical Association, such a visit usually

10

involved a patient who presented a problem of moderate to high severity, and a physician typically spent 45 minutes face-to-face with the patient or family.

       d.    For an office visit to be billed properly using CPT code 99214, it was required to have at least two of the three following key components: a detailed history of the patient's present illness; a detailed physical examination of the affected body region or organ system; and medical decision making of moderate complexity. According to the American Medical Association, such a visit usually involved a patient who presented a problem of moderate to high severity, and a physician typically spent 25 minutes face-to-face with the patient or family.

       e.    For an office visit to be billed properly using CPT code 99213, it was required to have at least two of the three following key components: an expanded problem focused history; an expanded problem focused examination of the affected body region or organ system; and medical decision making of low complexity. According to the American Medical Association, such a visit usually involved a patient who presented a problem of low to moderate severity, and a physician typically spent 15 minutes face-to-face with the patient or family.

       3.    Beginning no later than in or about February 2012, and continuing until on or about March 7, 2013, at Chicago, in the Northern District of Illinois, and elsewhere,

MOHAMMED SHARIFF and
THEODORE GALVANI,

defendants herein, and others, did knowingly and willfully conspire to violate Title 18, United States Code, Section 1347, that is, to execute a scheme to defraud a

11

health care benefit program, namely, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property under the custody and control of that program in connection with the delivery of and payment for health care benefits and services.

4.     It was part of the conspiracy that, for the purpose of fraudulently receiving payments from Medicare, defendant SHARIFF arranged for defendant GALVANI to meet with and prescribe controlled substances to Medicare beneficiaries at Midtown Medical Center, knowing that such beneficiaries did not have a legitimate medical need for the controlled substances being prescribed. SHARIFF and GALVANI engaged in this conduct for the purpose of enriching themselves by falsely billing Medicare for the beneficiaries' visits.

5.     It was further part of the conspiracy that defendants SHARIFF and GALVANI, and others, caused the submission of false and fraudulent claims to Medicare for services that were not medically necessary and using higher-paying codes (*e.g.*, CPT codes 99204, 99213, and 99214) than were justified by the services actually rendered by GALVANI.

6.     It was further part of the conspiracy that defendants SHARIFF and GALVANI caused Midtown Medical Center staff to provide false information to Midtown Medical Center's Medicare billing service, knowing that this false information, including the use of inapplicable CPT codes, would be submitted to Medicare for reimbursement.

7.     It was further part of the conspiracy that defendants SHARIFF and GALVANI, and others working on their behalf, caused Midtown Medical Center to fraudulently bill Medicare in the amount of approximately $351,958.

8.     It was further part of the conspiracy that defendants SHARIFF and GALVANI fraudulently caused Medicare to pay approximately $180,268 in reimbursements to Midtown Medical Center, including funds electronically transferred to account XXXXX6526 at TCF Bank, which SHARIFF controlled. SHARIFF and GALVANI split the fraudulent Medicare reimbursement funds received by Midtown Medical Center.

9.     It was further part of the conspiracy that defendants SHARIFF and GALVANI, and others misrepresented, concealed and hid, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the scheme and the purposes of those acts.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION ONE

The SPECIAL JANUARY 2015 GRAND JURY alleges:

1.     Upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, as set forth in this Indictment, defendants MOHAMMED SHARIFF, THEODORE GALVANI, and IRFAN MOHAMMED shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained, directly and indirectly, as a result of the offense; and any property used, and intended to be used, in any manner and part, to commit and facilitate commission of the offense, as provided in Title 21, United States Code, Sections 853(a).

2.     The property to be forfeited includes, but is not limited to, a personal money judgment in the amount of approximately $584,188.

3.     If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

14

## **FORFEITURE ALLEGATION TWO**

The SPECIAL JANUARY 2015 GRAND JURY further alleges:

1.    Upon conviction of an offense in violation of Title 18, United States Code, Section 1349, as set forth in this Indictment, defendant MOHAMMED SHARIFF shall forfeit to the United States of America any property that constitutes and is derived, directly and indirectly, from the gross proceeds traceable to the commission of the offense, as provided in Title 18, United States Code, Section 982(a)(7).

2.    The property to be forfeited includes, but is not limited to, a personal money judgment in the amount of approximately $180,268.

3.    If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY